IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:08-CV-96-FL

| | | |
|---|---|---|
| RODNEY COLLINS and LEAH COLLINS, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | ORDER |
| COTTRELL CONTRACTING CORPORATION, | ) ) ) ) | |
| Defendant. | ) ) | |

NO. 7:08-CV-190-FL

| | |
|---|---|
| In the Matter of the Complaint of COTTRELL CONTRACTING CORPORATION, Owner of the Dredge Marion, For Exoneration from or Limitation of Liability | ) ) ) ) ) |

This matter comes before the court in these consolidated cases on the motion of Rodney and Leah Collins ("plaintiffs") to increase the value of and security for the limitation fund (DE # 29), the motion of Cottrell Contracting Corporation ("defendant") for partial summary judgment (DE # 40), and the parties' motions in limine to limit or exclude testimony of certain expert witnesses (DE ## 39, 42, 64). Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), United States Magistrate Judge David W. Daniel entered a memorandum and recommendation ("M&R") wherein he recommends that the court deny plaintiffs' motion to increase the limitation fund, grant in part and deny in part defendant's motion for partial summary judgment, grant in part and deny in

part plaintiffs' motion in limine, and deny defendant's motions in limine. The parties have timely filed objections to the M&R, and have likewise responded to one another's objections. In this posture, the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

On June 11, 2008, plaintiffs filed suit pursuant to the Jones Act, 42 U.S.C. § 688, against defendant, the owner of the Dredge *Marion* and plaintiff Rodney Collins' employer (No. 7:08-CV-96-FL). According to the complaint, plaintiff Rodney Collins was injured in the course of his employment and while in the service of the *Marion* as a result of the negligence of defendant and/or the unseaworthiness of his vessel. On November 13, 2008, defendant filed a complaint pursuant to 46 U.S.C. §§ 30501-30512 for exoneration from or limitation of liability (No. 7:08-CV-190-FL). On November 24, 2008, the court accepted defendant's Ad Interim Stipulation for Costs in the amount of $1,500,000.00 for the value of the *Marion*. On December 30, 2008, the court consolidated the two actions on the joint motion of the parties.

On October 9, 2009, plaintiffs moved for partial summary judgment as to the limitation action, seeking to increase the value of the limitation fund and to increase the amount of security posted by defendant. Plaintiffs seek to increase these amount by $2,263,300.00, which is the value of a dredging contract between defendant and the United States Army Corps of Engineers, arguing that this contract constituted "pending freight" as that term is used in 46 U.S.C. § 30505(a). Also on October 9, 2009, plaintiffs filed a motion in limine asking the court to strike portions of the expert disclosures of Mr. Decator Harrell Austin and to preclude him from testifying to the same at trial.

On October 13, 2009, defendant filed a motion for partial summary judgment as to the Jones Act action. Defendant contends that there are no genuine issues of material fact regarding certain

2

of plaintiff's claims and allegations in support of certain other claims. Also on October 13, 2009, defendant filed a motion in limine to limit or exclude the testimony of three of plaintiffs' experts: Dr. Pedro Steven Buarque de Macedo, Mr. Edward G. Webster, and Mr. Stephen Harned. On April 15, 2010, defendant moved to further limit or exclude the testimony of Mr. Harned.

On June 4, 2010, the magistrate judge filed his M&R. First, the magistrate recommended denying plaintiff's motion for summary judgment because the dredging contract was not pending freight. Second, the magistrate judge would hold that plaintiffs' loss of consortium claim is not available under the Jones Act, but that defendant's remaining arguments in its motion for summary judgment are improper in form. Third, the magistrate judge recommends striking in part the proposed testimony of defendant's expert. Finally, the magistrate judge recommends denying defendant's motion in limine, finding no fault in plaintiffs' experts' proposed testimony.

Plaintiffs and defendant filed their respective objections to the magistrate judge's M&R on June 18, 2010. Plaintiffs responded to defendant's objection on July 2, 2010, and defendant responded to plaintiff's objection on July 5, 2010.

## STATEMENT OF UNDISPUTED FACTS

The M&R contains a thorough recitation of the relevant facts, to which the parties do not object. After careful review, the court adopts the magistrate judge's undisputed factual findings as its own, which are set forth below for the benefit of the reader:

> On November 8, 2006, the Army Corps of Engineers awarded Cottrell a contract to perform maintenance dredging of four channels in North Carolina: Hatteras Inlet, Wainwright Slough, Atlantic Harbor, and Taylor's Creek at Beaufort (the "Contract"). The final Contract price was $2,363,300, $100,000 of which was payment for land-based dike improvements on Carrot Island. Cottrell utilized the non-self-propelled Dredge *Marion*, a cutter/suction dredge, which was just over 100 feet long, to perform the dredging operations under the Contract. From January

through March 2007, the *Marion* was used to dredge the Hatteras Inlet and Wainwright Slough channels. For most of April, the *Marion* dredged the channel at Atlantic Harbor, pumping the spoils, pursuant to the Contract, to an area called "New Dump Island." The Contract required Cottrell to bring a bulldozer to New Dump Island to reshape or spread out the material dumped there, and to later remove the bulldozer. By approximately the end of April 2007, Cottrell had completed the Atlantic Harbor dredging project under the Contract. Collins was injured on May 6, 2007. At that time, Cottrell had completed three of the four dredging projects specified under the Contract, and only the smallest dredging project remained at Taylor's Creek.

On May 6, 2007, Cottrell and the *Marion* crew were not executing dredging operations. Because the dredging of the Atlantic Harbor was completed, the majority of the *Marion*'s crew had been sent home. Rodney Collins, the long-time chief engineer, and Captain Terry Evans, who had also been a captain for several years, were still working on the *Marion*. Captain Evans was notified on Saturday, May 5, 2007, by the Army Corps of Engineers that Cottrell needed to remove the bulldozer from New Dump Island before any birds nested on it (which would mean the bulldozer would have to stay until the next year). Captain Evans called in a two crew members to assist, only one of whom arrived the next morning to help. Thus, Captain Evans, Rodney Collins, and crewman David Gore were aboard the *Marion* Sunday morning, May 6, 2007, for the bulldozer removal. On Captain Evans' orders, David Gore proceeded in a tender boat, pushing Cottrell's derrick (onto which they would load the bulldozer) as close to New Dump Island as he could get it. Captain Evans directed Collins to drive him in the skiff (which was a johnboat that was tied alongside the *Marion*) to the shallows close to the island. Captain Evans went ashore, and he eventually successfully placed the bulldozer on the derrick. After getting ashore, Captain Evans sent Collins back by himself in the skiff to the *Marion*. No one was aboard the *Marion* when Collins was attempting to tie up the skiff to it. Collins was injured when he fell overboard as he tried to tie up the skiff to the *Marion* so that he could board the *Marion*.

There is heated factual dispute, including expert testimony on both sides, as to the exact weather conditions, water activity, and the events surrounding Collins' attempt to tie up the skiff to the dredge. There is no dispute, however, that the task at hand on the day in question – removing the bulldozer – was "demobilization" activity under the Contract. Mobilization and demobilization, generally, were included in the Contract price as a "lump sum price," sixty percent of which was paid upon mobilization at the work site and the balance of which was paid upon completion of demobilization. . . . [T]he Contract price for mobilization and demobilization generally was $875,000. Thus, there was no separate mobilization and demobilization price for the Atlantic Harbor phase of the Contract performance. The

4

four phases of dredging, however, did each have a line item contract price for the amount of material removed.

Sometime after May 6, 2007, the *Marion* was towed to Taylor's Creek and dredged the channel there. The Taylor's Creek dredging completed the last phase of the Contract. Cottrell finished the Contract on June 13, 2007. Thus, it took six months for Cottrell to complete the work required under Contract.

(M&R 3-5 (internal citations and some quotation marks omitted)).

## DISCUSSION

A.   Motions for Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

1.   Motion to Increase the Value of the Limitation Fund

Under 46 U.S.C. § 30505(a), the owner of a vessel may limit his or her liability as a defendant in the type of action asserted here to no more than "the value of the vessel and pending freight." Defendant has stipulated that the value of the *Marion* is no more than $1,500,000.00, and the court has accepted this stipulation. The question now presented by plaintiffs in their motion for summary judgment in No 7:08-CV-190-FL is whether the value of the dredging contract is "pending

freight" as that term is used in the statute. The magistrate judge would hold that only the unquantifiable portion of the contract relating to the removal of the bulldozer during which plaintiff Rodney Collins was injured is "pending freight" as it relates to this action. Plaintiffs object to this recommendation.

"Pending freight" refers generally to "freight for the voyage." The Black Eagle, 87 F.2d 891, 894 (2d Cir. 1973); see also In re Norfolk Dredging Co., No. 7:02-CV-110-F, 2003 WL 23180522, at *6 (E.D.N.C. Aug. 11, 2003). In The Main v. Williams, 152 U.S. 122, 129 (1894), the Supreme Court noted that the term "freight" is not limited to the fare for the transportation of goods, but also may include any and all "rewards, hire, or compensation, paid for the use of ships, either for an entire voyage, one divided into sections, or engaged by the month, or any period." On this reasoning, courts have held that the value of a dredging contract may be included as pending freight. See, e.g., The Carson, 104 F.2d 762, 765 (9th Cir. 1939); In re N. Am. Trailing Co., 763 F. Supp. 152, 162 (E.D. Va. 1991). Because value of pending freight is measured in terms of a particular voyage, see The Main, 152 U.S. at 131-32, the question remains whether the relevant "voyage" here consists of the entire multi-phase dredging contract or only a discrete portion thereof.

Plaintiffs urge that the entire value of the contract be included in the contract price, likening the multi-phase contract to a round-trip voyage or a situation in which a vessel delivers cargo at multiple ports en-route to its final destination, either of which constitutes a single voyage in assigning a value to "pending freight." See, e.g., In re Caribbean Sea Transport, Ltd., 748 F.2d 622, 626-27 (11th Cir. 1984) (citing cases). The determination of the relevant voyage, however, is a fact-specific inquiry that depends on the particular circumstances of the situation presented. Id. at 626. The court believes that this court's earlier decision in Norfolk Dredging, 2003 WL 23180522, as well

as a sister court's decision in In re Offshore Speciality Fabricators, Inc., No. 01-2227, 2002 WL 827398 (E.D. La. Apr. 30, 2002), offer more appropriate analogues to the factual scenario presented here than do the cases suggested by plaintiffs.

In Norfolk Dredging, this court was required to define the scope of the "common enterprise" of a number of vessels engaged in dredging operations. Under the so-called "flotilla doctrine," the value of all vessels "engaged in a common enterprise or venture with the vessel aboard which the loss or injury was sustained" may be included in the limitation amount. Complaint of Patton-Tully Transp. Co., 715 F.2d 219, 222 (5th Cir. 1983).[1] The claimant in Norfolk Dredging argued that the entirety of the dredging project should be included as the "common enterprise" in which the vessels were operating. 2003 WL 23180522, at *5. The court disagreed, concluding that "the scope of the 'common enterprise' requirement on the facts of this case is limited to the particular task, venture or work at hand, rather than to all work contemplated by the two-phase . . . dredging contract." Id.; cf. In re Orion Dredging Servs., LLC, No. 3:09-CV-358-J-25HTS, 2009 WL 5171756, at *3 (M.D. Fla. Dec. 23, 2009) (holding that "the relevant voyage" in determining a common venture was the voyage to the dredge site rather than the entirety of the dredging project).

Norfolk Dredging is by no means dispositive here. As mentioned, the court was dealing with the flotilla doctrine, and "common enterprise" is not necessarily synonymous with "voyage."[2] But as the court in Offshore Speciality Fabricators (as well as the magistrate judge here) recognized, the

---

[1] As this court previously noted, the Fourth Circuit has never adopted or even explicitly discussed the "flotilla doctrine." See In re Norfolk Dredging Co., 2003 WL 23180522, at *4.

[2] The only mention of "pending freight" in Norfolk Dredging dealt with claimant's attempts to get the value of a contract between a third-party (the defendant in the instant case) and the Army Corps of Engineers included in the value of subcontractor Norfolk Dredging's limitation fund. See 2003 WL 23180522, at *6. The court refused to include the contract as pending freight, finding "the value of that contract in no way . . . relevant" where the particular vessel on which claimant was injured was not the "main instrument of performance" for the overall dredging contract. Id. at *7.

7

analysis of one issue informs the other. In Offshore Speciality Fabricators, the court was faced with a tugboat that sunk on its way to assist two other vessels involved in the second phase of a construction contract. After first determining that the tug was engaged in a "common enterprise" with the other two vessels in performing the second phase of the dredging contract, the court turned to the value of the "pending freight" of the three vessels. The court concluded that, "[g]iven the distinct phases of the project," the same analysis was appropriate in determining the "voyage" as it had used in determining the "common venture." 2002 WL 827398, at *5. The court recognized that though the project could be measured by "the entire value of the contract at issue," to include this amount in the limitation fund "would be to increase the fund beyond the scope of the 'voyage.'" Id. Accordingly, the court increased the limitation fund only by the amount pertaining to the second phase of the contract. Id.

As in Offshore Speciality Fabricators, and consistent with Norfolk Dredging, the court finds that the entirety of the multi-part dredging contract at issue in the instant case, including four separate dredging projects and mobilization and demobilization of those projects do not constitute the relevant "voyage" for purposes of measuring "pending freight." Instead, the pending freight of the *Marion*, engaged in a discrete phase of a multi-phases contract, includes the amount allotted only to the discrete phase at issue here – the demobilization of the bulldozer from New Dump Island.[3] And although the contract stipulates that the value of mobilization and demobilization generally is $875,000.00, where there is no method for precisely calculating the value of the specific removal of the bulldozer from New Dump Island, no amount will be added to the limitation fund. See In re

---

[3] The dredging contract cases cited by plaintiff, including N. Am. Trailing Co. and In re Falcon Inland, Inc., 1998 WL 185222 (E.D. La. Apr. 16, 1998), are not to the contrary where those cases make no mention of the kind of multi-phase contract at issue here.

8

Bourgogne, 210 U.S. 95, 137 (1908). Plaintiffs' motion for partial summary judgment accordingly is DENIED.

2. Defendant's Motion for Partial Summary Judgment

As the magistrate judge correctly noted, there is agreement as to the disposition of two of the four matters raised in defendant's motion for partial summary judgment. First, defendant has withdrawn its motion as to plaintiff's maintenance and cure claim, conceding that there are unpaid medical bills and that there is a dispute as to whether these may be validly claimed by plaintiffs. Second, plaintiffs have not opposed defendant's motion for summary judgment on the loss of consortium claim, as such damages are not available under the Jones Act as a matter of law. See Miles v. Apex Marine, 498 U.S. 19, 31-32 (1990) (holding that loss of society damages are not recoverable for the wrongful death of a Jones Act seaman); Murray v. Anthony J. Bertucci Constr. Co., Inc., 958 F.2d 127, 131-32 (5th Cir. 1992) (extending Miles to Jones Act personal injury claims). Without objection, the court agrees with the magistrate judge's conclusion that defendant's motion should be granted as to plaintiffs' loss of consortium claim but denied as to the maintenance and cure claim.

The remaining two matters raised by defendant are contested. Specifically, defendant seeks partial summary judgment on five of the twelve factual allegations supporting plaintiffs' unseaworthiness claim, and on six of the fifteen allegations supporting plaintiffs' negligence claim.[4] According to defendant, these allegations do not enjoy any evidentiary support. Without addressing

---

[4] Because the challenged allegations in plaintiff's unseaworthiness and negligence claims overlap, defendant challenges only seven specific allegations: (1) that the *Marion*'s deck was not clean and free of obstructions; (2) that the *Marion* was maintained with insufficient, defective, improper, and unsafe equipment; (3) that the cleat was improperly located so as not to allow reasonably safe access to it; (4) that there was no reasonable means of ingress and egress to the *Marion*; (5) that defendant was negligent in failing to rescue plaintiff Rodney Collins from the perils of the sea; (6) "any other unseaworthiness"; and (7) "any other negligence."

9

whether there was any evidence supporting these allegations, the magistrate judge recommended denying the motion as improper in form. The magistrate judge would hold that Rule 56 may not be used to prune factual allegations from a complaint or to render decision on part of a claim. Defendant objects to this interpretation of Rule 56.

Defendant contends that the plain language of Rule 56 permits the court to grant summary judgment on part of a claim. Specifically, Rule 56(b) states that "[a] party against whom relief is sought may move . . . for summary judgment on all or part of the claim." In the event that summary judgment is not rendered on the whole action, Rule 56(d) further directs the court to "issue an order specifying what facts – including items of damages or other relief – are not genuinely at issue." However, a number of courts have concluded that a motion for summary judgment may not properly seek to dispose of only a factual allegation or element of a single indivisible claim for relief. See, e.g., Franklin-Mason v. Penn, 259 F.R.D. 9, 11 (D.D.C. 2009); Evergreen Int'l v. Marinex Constr. Co., 477 F. Supp. 2d 697, 298 (D.S.C. 2007) (citing cases); N.J. Auto. Ins. Plan v. Sciarra, 103 F. Supp. 2d 388, 396 (D.N.J. 1998).

The court agrees with the holding of these cases as a general matter, although summary judgment may be appropriate as to a part of a claim in rare circumstances not presented here.[5] Defendant's motion essentially seeks to strike certain allegations from the complaint as unsupported, rather than to establish as undisputed any element of plaintiffs' unseaworthiness or negligence

---

[5] For example, under copyright law, a plaintiff who is successful on the merits of an infringement action against a defendant is entitled to that portion of the defendant's profits which are "attributable to the infringement." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting 17 U.S.C. § 504(b)). The statutory scheme creates "an initial presumption that [these profits] . . . are equal to the infringer's gross revenue," and the burden is on the defendant to "demonstrate that certain portions of its revenue were due to factors other than the infringement . . . ." Id. at 520. The Fourth Circuit held that a defendant "could properly be awarded summary judgment with respect to any given revenue stream" if the defendant could show no connection between the infringement and those revenues. Id. at 522-23. Although the result could be termed a partial summary judgment on a portion of the claim, the specific statutory scheme drove the result in Bouchat, rather than any discussion of Rule 56.

10

claims. Even if these allegations were stricken, the entirety of plaintiffs' claims would still go to trial and no "judgment" could be entered as to those portion of the claims on which defendant received a favorable ruling.

Defendant's motion as to the unseaworthiness and negligence claims is improper in form as no relief is available under Rule 56(b) and Rule 56(d) is not an independent motion for adjudication of undisputed facts prior to trial. Accordingly, and also in light of the court's earlier discussion of the claims for maintenance and cure and loss of consortium, defendant's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to plaintiffs' loss of consortium claim, and denied with respect to all other claims.

B.  Motions in Limine to Exclude Expert Testimony

Rule 702 of the Federal Rules of Evidence serves as the "guidepost" for the admissibility of expert testimony. See United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007). That rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993).

In considering whether expert testimony is admissible, the court acts as a gatekeeper to determine whether the proffered testimony is both sufficiently reliable and relevant. United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)). The court's "flexible" inquiry focuses on the "principles and methodology" employed by the expert rather than the expert's conclusions. Id. (quoting Daubert, 509 U.S. 594-95). The court may consider "whether the method used is generally accepted in the scientific community; the

11

rate of error, if known; the existence and maintenance of standards; and whether the expert's work has been subjected to peer review." Id. (citing Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 261 (4th Cir. 2005)); see also Daubert, 509 U.S. at 592-94. However, these factors are not exclusive, and the court has considerable latitude in considering other factors that bear upon an expert's reliability in a particular case. Kumho Tire Co., 526 U.S. at 149-153

Ultimately, the court must keep in mind "two guiding, and sometimes competing, principles" in deciding on the admissibility of expert testimony. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, "Rule 702 was intended to liberalize the introduction of relevant expert evidence[,]" and the court is not required to determine that expert testimony is "irrefutable or certainly correct." Id. (citing Cavallo v. Star Enter., 100 F.3d 1150, 1158-59 (4th Cir. 1996)). Any expert testimony will be subject to the same "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Id. (quoting Daubert, 509 U.S. at 596). On the other hand, however, the difficulty of evaluating an expert's testimony means that experts have "the potential to 'be both powerful and quite misleading.'" Id. (quoting Daubert, 509 U.S. at 595). Expert testimony may be particularly persuasive to the jury, and as such may have a "greater potential to mislead than to enlighten." Id. (citing United States v. Dorsey, 45 F.3d 809, 815-16 (4th Cir. 1995)).

1. Plaintiff's Motion

The parties make no objection to the disposition of plaintiffs' motion to exclude certain testimony of Mr. Decator Harrell Austin, an expert for defendant. The magistrate judge recommends excluding Mr. Austin's testimony at trial that Captain Evans "never would have undertaken the [bulldozer] operation" under particular circumstances because Mr. Austin is not qualified to opine about Captain Evans' state of mind. The magistrate judge recommends allowing Mr. Austin's

12

opinions about local weather conditions and the condition of the sea in the allegedly "protected area" in which the *Marion* was located. After a considered review, the court agrees with the magistrate judge's recommendation that plaintiff's motion in limine be GRANTED IN PART and DENIED IN PART as set forth above.

2. Defendant's Motions

Defendant does object to the magistrate judge's disposition of the two motions in limine challenging three of plaintiff's experts, Dr. Pedro Steven Buarque de Macedo, Mr. Stephen Harned, and Mr. Edward G. Webster. Dr. Macedo is a board-certified neurologist, and would testify to the medical condition of Rodney Collins following the accident. Mr. Harned is a meteorologist, and would testify to the wind and wave conditions at the *Marion* at the time of the accident. Mr. Webster is a marine surveyor and naval architect, and would testify primarily about marine safety. The magistrate judge would hold that the testimony of these individuals is admissible, and recommended that defendant's motions be denied.

a. Dr. Macedo

Defendant challenges five of the eleven specified opinions contained in Dr. Macedo's report, arguing that they were adopted entirely from reports of other doctors and are inadmissible hearsay. The challenged opinions include that plaintiff Rodney Collins "has been left with a residual musculoskeletal disability," that he "has permanent cognitive impairments" due to a number of factors, and that he will require "intensive" psychological treatment going forward. In forming these opinions, Dr. Macedo states that he relied on tests and reports by Dr. Eric Meyer, a chiropractor, and Dr. Suzanne Southworth, a psychologist.

In seeking to exclude Dr. Macedo's testimony, defendant relies primarily on this court's decision in Bouygues Telecom, S.A. v. Tekelec, 472 F. Supp. 2d 722 (E.D.N.C). In Bouygues,

13

plaintiff originally attempted to designate seven expert witnesses, but was limited by the court to only five. Id. at 730. Plaintiff was allowed to supplement the opinions of the remaining experts, but only "to the extent they were qualified to speak to such information." Id. Instead of supplementing their reports, however, plaintiff's experts "merely attach[ed] and adopt[ed] verbatim the withdrawn expert reports." Id. The court held that that while an expert may "adopt[] or incorporat[e] ideas, information, and analysis of other with expertise in the same field, . . . an expert with a perhaps overlapping, yet admittedly different, area of expertise should [not] be permitted to merely adopt and incorporate verbatim another's 'expert' opinion." Id.

The instant case is unlike Bouygues. Unlike the situation in Bouygues where the challenged opinion included the wholesale adoption of the opinions of other experts, the opinions of Dr. Macedo's are his own. As the magistrate judge noted:

> [Dr. Macedo] personally conducted EMG needle testing on [plaintiff Rodney] Collins, and . . . although his technician did the more time-consuming neuroconduction studies, Dr. Macedo closely reviewed the data and determined them acceptable. Then, Dr. Macedo had a colleague at his practice, Dr. Southworth, conduct the neuropsychological examination, and he relied upon her data points after he talked to her extensively about her assessment and reviewed her scored data and results. Dr. Macedo then had a chiropractor in his group, Dr. Meyer, conduct the function capacity evaluation ("FCE"). Dr. Macedo reviewed all the data from Dr. Meyer's testing, with an eye to modifying the FCE as he saw fit, because [Dr. Macedo himself] signed the FCE.

(M&R 27 (internal quotation marks and citations omitted)). Moreover, as a physician and board-certified neurologist, Dr. Macedo's opinions as to plaintiff Rodney Collins' health, including the specific diagnoses put forward here, are well within the scope of his expertise.

Under Rule 703, facts or data that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject . . . need not be admissible in evidence in order for the opinion or inference to be admitted." Even if the genesis and almost all of

14

Dr. Macedo's opinions may be found in tests and reports that are inadmissible, the resulting opinion remains admissible where the court finds that these tests and reports to be exactly the type reasonably relied on by physicians such as Dr. Macedo. See, e.g., Westfield Ins. Co. v. Harris, 134 F.3d 608 (4th Cir. 1998). Indeed, the Advisory Committee Notes to Rule 703 expressly contemplate that "a physician in his own practice [may] base[] his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and x-rays." See also Westfield Ins. Co., 134 F.3d at 612.

That the tests may have been run and the reports generated with an eye towards litigation, a fact that is currently contested, is not sufficient reason to reject expert testimony that is both sufficiently reliable and relevant. Moreover, as the magistrate judge noted, defendant will have the ability to vigorously cross-examine Dr. Macedo about the bases for his opinions, including his reliance on the data and reports of others. Accordingly, defendant's motion to exclude the testimony of Dr. Macedo is DENIED.

      b.    Mr. Harned

The magistrate judge found the proposed testimony of Mr. Harned, a meteorologist with more than forty years of experience, regarding wind and wave conditions at the *Marion* to be both reliable and relevant to whether there were "rough seas" at the time of the accident. Defendant challenges Mr. Harned's proposed testimony as irrelevant insofar as it relates to wind and wave heights at locations other than the *Marion*. Defendant also accuses Mr. Harned of improperly "parroting" the testimony of defendant's own expert, Dr. Patrick J. Hudson, and of mischaracterizing Dr. Hudson's testimony. According to defendant, Mr. Harned cites Dr. Hudson as calculating a wave height of 0.6 feet at the port side of the *Marion* when the actual calculation was 0.3 feet.

15

The court finds that defendant's first objection is without merit. The wind and wave conditions at the *Marion* are of course relevant to this matter. And Mr. Harned's opinion references conditions at Pamlico Sound and Core Sound, the locations challenged by defendant as irrelevant, in his calculations in order to reach an ultimate conclusion about conditions at the *Marion*. There is little danger that the jury will be misled by any testimony as to the conditions at these locations. Cross-examination and jury instructions will be more than sufficient to focus the jury's attention on Mr. Harned's conclusion as it relates to conditions at the *Marion* itself.

The court also finds defendant's second objection to be without merit. As already noted, an expert may rely on the work of another expert in forming his opinion without impermissibly "adopting" the other expert's opinion. See Westfield Ins. Co., 134 F.3d 608. Moreover, the court cannot conclude that Mr. Harned erred in his use of Dr. Hudson's figures. Dr. Hudson's report states that a maximum predicted significant wave height would be about 0.6 feet based on a particular chart, but that accounting for a reduction in wave height yields maximum wave heights of about 0.3 feet. Dr. Hudson's report further states that the wave heigh on the starboard side of the dredge could be expected to be between 0.6 feet and 2.0 feet.[6] It is unclear to the court then that Mr. Harned erred in using a figure of 0.6 feet in his own calculations. Defendant's motions to exclude the testimony of this individual are accordingly DENIED.

c.  Mr. Webster

The magistrate judge found Mr. Webster to be qualified as an expert on issues related to marine safety in light of his substantial experience, and would admit the entirety of his proposed testimony. Defendant's objection challenges two aspects of the magistrate judge's conclusion. First,

---

[6] Plaintiffs contend in their response that in his deposition Dr. Hudson clarified his report and confirmed that he had reached similar conclusions to Mr. Harned. However, the court has been unable to locate a copy of Dr. Hudson's deposition on the docket.

16

defendant contends that Mr. Webster failed to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." See Wilson, 484 F.3d at 274 (alterations in original). Second, defendant contends that Mr. Webster should not be allowed to testify to certain legal opinions.

The crux of Mr. Webster's opinion is that plaintiff Rodney Collins was not responsible for the accident, but rather that defendant and other agents of defendant were the cause. Mr. Webster bases this opinion on the failure to follow various safety policies set forth by the United States Coast Guard, the United States Army Corps of Engineers, and the Occupational Safety and Health Administration, as well as defendant's own internal safety policies. Mr Webster also relies on his own observation of the *Marion* as well as the testimony of Mr. Collins, the only witness to the incident.

Contrary to defendant's contention, the court finds that Mr. Webster has shown that his experience leads him to conclusions reached, that his experience is a sufficient basis for the opinion, and that his experience was reliably applied to the facts. Mr. Webster states that he has been actively engaged in the marine industry for 40 years, including as a marine engineer about the type of ship at issue here, and that he has vast experience with issues relating to marine safety. His report clearly discusses how he comes to each of his conclusions, which in many cases involve a straightforward discussion of whether defendant is in compliance with various safety codes with which Mr. Webster is familiar.

Moreover, the court does not believe that Mr. Webster is offering any improper legal opinions. Rule 704 permits an expert to opine on the ultimate issue to be decided by the trier of fact. The court finds that Mr. Webster's proposed testimony will assist the jury in navigating the complex waters of marine safety regulation, but they will not be bound by his opinions. Unlike defendant,

17

Case 7:08-cv-00096-FL   Document 74   Filed 08/05/10   Page 17 of 18

the court does not believe this case resembles Adalman v. Baker, Watts & Co., 807 F.2d 359 (4th Cir. 1986), in which the Fourth Circuit noted that a district court should not allow parties to call lawyers as expert witnesses to testify to the jury as to what the law means. Mr. Webster's testimony will not usurp the province of the court, but will instead put forward plaintiffs' theory as to how defendant may have been negligent and how the *Marion* may have been unseaworthy for failing to comply with recognized marine safety standards. According, defendant's motion to exclude the testimony of Mr. Webster is DENIED.

## CONCLUSION

Upon *de novo* review of those portions of the magistrate judge's M&R to which specific objections have been filed, and upon considered review of those portions of the M&R to which no such objection has been made, the court ADOPTS in full the findings and recommendations of the magistrate judge (DE # 68). Accordingly, plaintiffs' motion to increase the value of and security for the limitation fund (DE # 29) is DENIED. Defendant's motion for partial summary judgment (DE # 40) is GRANTED IN PART and DENIED IN PART. The motion is granted as to plaintiffs' loss of consortium claim, and denied with respect to all other claims.

Plaintiffs' motion in limine to limit or exclude testimony of Mr. Austin (DE # 39) is GRANTED IN PART and DENIED IN PART. Mr. Austin may not testify to Captain Evans' subjective state of mind. Defendant's motions in limine to limit or exclude the testimony of Dr. Macedo, Mr. Webster, and Mr. Harned (DE ## 42, 64) are DENIED.

SO ORDERED, this the 5th day of August, 2010.

LOUISE W. FLANAGAN
Chief United States District Judge